Estate of Adelaide F. Stitt, Edna Stitt Robinson and Marguerite Stitt Church, Executrices v. Commissioner.
Estate of Adelaide F. Stitt v. Commissioner
Docket No. 15503.
United States Tax Court
1948 Tax Ct. Memo LEXIS 19; 7 T.C.M. (CCH) 920; T.C.M. (RIA) 48257; December 8, 1948
*19 Upon the facts, held, that certain transfers of property made by decedent in December, 1941, were not made in contemplation of death. Lee McCanliss, Esq., 31 Nassau St., New York, N. Y., for the petitioners. William A. Schmitt, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: The respondent determined a deficiency in estate tax in the amount of $27,778.65. The only question involved is whether certain transfers of property by decedent to her two daughters were made in contemplation of death. The estate tax return was filed with the collector of internal revenue for the third district of New York. A part of the facts are stipulated and are so found. Findings of Fact Adelaide F. Stitt, *20 decedent herein, was born in 1859. She died June 18, 1944, of pneumonia at the age of 85. Decedent married William J. Stitt on February 7, 1884. They had two children, Edna (now Mrs. Millard L. Robinson) born December 24, 1884, and Marguerite (now Mrs. Ralph E. Church) born September 13, 1892. William J. Stitt, prior to 1930, had accumulated considerable wealth. He died in 1930, leaving one-half of his estate to decedent and one-fourth each to Edna and Marguerite. The property received by each daughter had a value of approximately $350,000 at the date of their father's death and in the case of each included the following: Value at date of death
of William J. Stitt
Jacob Adler & Sons, Inc. *
1,250 shares common
$56,275.00
375 shares 7% $100 p v
cum pfd
37,500.00
$ 93,775.00
The Hereford Corporation **
375 shares common
$32,613.75
250 shares 7% $100 p v
cum pfd
25,000.00
57,613.75
The Kelmscott Corporation ***
375 shares common
$29,969.00
250 shares 7% $100 p v
cum pfd
25,000.00
54,969.00
$206,357.75
*21 The above securities constituted roughly 60 per cent of the respective distributable shares of the estate which Edna and Marguerite received. By 1932 all three of the above companies had met financial disaster. Each of the daughters sustained a loss of at least one-half of the aforesaid $206,357.75, which she had inherited from her father. They did not receive any dividend payments from Jacob Adler & Sons, Inc., after 1931 and they received no further dividend payments from the Hereford and Kelmscott corporations after 1932. Jacob Adler & Sons, Inc., was dissolved in 1936 and both the Hereford and Kelmscott corporations were dissolved in 1944. The latter two corporations continued operating until that date in part due to loans made to them by decedent and her two daughters down through 1939. In 1936 decedent suffered a cerebral accident, commonly known as a light paralytic stroke. The next day she was able to discuss her condition with one of her daughters and laughed about the stroke having taken place while she was praying at a church meeting. She was thoroughly able to discuss it. At the time this illness occurred decedent was 77 years of age. After the stroke decedent was *22 confined to her bed for several weeks and to her room for approximately two and a half months. Her condition grandually improved thereafter. Two nurses were employed to take care of her. They remained with her from 1936 to 1944, the year of her death. They assisted her in satisfying her desires and particularly in the last three years of her life read to her because of her partial blindness caused by cataracts on her eyes which by the latter part of 1941 had reached an advanced stage of development. Her daughter, Edna, who together with her husband, lived in an adjoining apartment, also was a constant visitor of decedent from 1936 to 1944. A physician attended decedent at the time she suffered the stroke in 1936 and visited her 118 times from that date until December 31, 1941, when she transferred the property here in question to her daughters, as hereinafter more fully described. After that date she was visited by her physician on 85 different occasions. In the fall of 1936, or approximately six or seven months after she suffered the stroke, decedent was able to be up and about the greater part of the day. Her right side continued to be weak until her death, but she was able to *23 walk when leaning on someone's arm and could use her right hand. Decedent went to her summer home during the summers from 1936 through 1941. Six or seven months after her stroke in 1936 decedent was able to, and did attend to her business affairs. She kept abreast of current events through the press and radio. She also voted and participated to some extent in church activities. In 1940 decedent made 24 separate charitable contributions to 24 separate institutions, ranging in amounts from $1 to $762 and totalling $1,724.20. In 1941 decedent made 32 separate charitable contributions to 32 separate institutions ranging in amounts from $1 to $600 and totalling $1,325. In 1942 she made 35 separate charitable contributions to 35 separate institutions ranging in amounts from $1 to $600 and totalling $1,362.20. On May 8, 1939, decedent executed her last will and testament. In the will she made cash bequests of $10,000 each to her daughters Edna and Marguerite, together with numerous other cash bequests. In addition she established a $10,000 trust each for her two grandsons and a granddaughter, all children of her daughter, Marguerite. The income from these trusts was to go to the support, *24 maintenance and education of the grandchildren until they reached the age of 25 years, when they were to receive the principal. After making several bequests to religious and charitable institutions, she devised and bequeathed the residue of her estate to her two daughters, share and share alike. The daughters were named executrices of her last will and testament. The estate tax return of decedent showed a gross estate of $341,716.50. In the period from 1936 until her death, decedent did not spend all of her income but had from $500 to $1,000 to reinvest each year. In December 1941 Marguerite's children were 21, 17 and 12 years of age, respectively. Marguerite's husband had been a member of Congress for six years prior to 1940. In that year he sought election to the United States Senate and was defeated. Because of the change of their residence approximately every six months during the period of Ralph E. Church's services in Congress, they thought it best to place their daughter in a private school near Evanston, Illinois. By December 1941 Marguerite's two sons were attending Princeton University, one a senior and the other a freshman. By 1941 the income of Marguerite and her *25 husband had decreased. Marguerite's husband, an attorney, was in the process of rebuilding his law practice, most of which he had lost while serving as a member of Congress. He also faced the possibility of being called to active service as a Lieutenant Commander in the Naval Reserve. In 1941 Marguerite and her husband filed a joint tax return in which they reported as follows: Gross Income
Dividends
$ 6,969.75
Interest
2,614.88
Rents and Royalties
231.39
Net profits from business or
profession
6,975.00
Income from partnership
10,511.72
$27,302.74
Deductions
Capital loss
$15,232.12
Other deductions
3,312.35
18,544.47
Net income
$ 8,758.27
During the summer of 1941 Mrs. Church visited her mother in New York. During such visit decedent inquired of Mrs. Church about her financial affairs and about her children's schooling. Mrs. Church told decedent that she wanted to put her young daughter in a good preparatory school and that she thought it would be well to place her younger son in a good State college since that would be less expensive than Princeton University. Decedent agreed with the idea of a preparatory school for the daughter but expressed *26 the conviction that the younger son should go to Princeton and stated that this had been the wish of her deceased husband. In order to supplement the income of Mrs. Church to enable her to send her younger son to Princeton, decedent decided to transfer property to Mrs. Church that would yield the required supplemental income. It had always been the practice of decedent and her deceased husband to treat impartially their two daughters in the matter of gifts of property. In keeping with that practice decedent decided also to make a gift of substantially equal value to her other daughter, Mrs. Robinson. Necessary arrangements for such transfers were made by decedent through one of her attorneys. In the latter part of December 1941 decedent transferred mortgages and real property having a value of $34,372.64 to Mrs. Robinson and mortgages and real property having a value of $34,346.50 to Mrs. Church. It was estimated that this property would produce approximately $1,500 income annually for each daughter. Mrs. Church stated this was the approximate amount required by them each year to keep their younger boy in Princeton University. In 1944 decedent became ill. The doctor diagnosed her *27 case as pneumonia. She died on June 18, 1944. There was not direct relation between the stroke she suffered in 1936 and the cause of her death in 1944. Respondent, in his deficiency notice under "Explanation of Adjustments", stated as follows: Returned
Determined
"Transfers:
$ 0.00
$72,769.14
"The sum of $72,769.14, representing the value as of date of death of property transferred by the decedent to her daughters on December 30, 1941, is included in the gross estate pursuant to Section 811 (c) of the Internal Revenue Code." The gifts here in question were not made by decedent in contemplation of death. Opinion The only question for decision is whether the transfers of property made by decedent in 1941 to her two daughters were in contemplation of death. If so, the value of the gifts at the time of decedent's death is includible in her gross estate under section 811 (c), Internal Revenue Code. Petitioners contend that the motive which impelled the transfers in question were associated with life rather than with death. They argue that the gifts grew out of decedent's knowledge that her son-in-law and *28 daughter, Ralph E. and Marguerite Church, were in need of roughly $1,500 additional yearly income to send their younger son to Princeton University, where decedent wanted her grandson to receive his college training. And they further contend that the transfers were motivated, in part, by decedent's desire to increase by approximately $1,500 annually the alleged insubstantial income of her other son-in-law (a minister) and daughter, Millard L. and Edna Robinson. Respondent, on the other hand, contends that the thought of death on the part of decedent was the impelling cause of the transfers in question. On the basis of the evidence in the record we have found that such transfers were not made in contemplation of death. We have made this finding notwithstanding the fact that the decedent was at the time of the gifts in question 81 years of age, frail and almost totally blind. The evidence is uncontradicted that decedent conducted her own business affairs and was interested in her normal activities such as church work and a comprehensive list of charities. She was also alert about current events and the affairs of the world. Unquestionably, she was deeply interested in the welfare *29 of her daughters and the proper education of her grandchildren. There is nothing in the evidence to indicate that decedent's thoughts were centered upon the idea of her impending death. During the approximately eight years following her stroke in 1936 it is in evidence that frequent visits were made to decedent at her residence by her physician. Apparently such visits were largely for the purpose of observation of decedent's condition from time to time it was testified by her attending physician that he gave no treatments to decedent at her residence but merely made general examinations and gave directions to the nurses in attendance. He also testified that "On the basis of my calls upon Mrs. Stitt in the period 1937-1942, and the resulting familiarity I had with her daily life, activities and interests, it is my opinion that Mrs. Stitt's frame of mind was that of a person who expected to live many years more." To find and hold that the transfers in question were impelled by the thought of death would require a resort to mere inferences which are negatived by positive evidence. Accordingly, we find and hold that such transfers were not made in contemplation of death. Decision will *30 be entered under Rule 50. Footnotes
*. Manufactured gloves. ↩
**. Owned 12-story apartment building, real estate, mortgages and other securities. ↩
***. Owned 12-story apartment, real estate, mortgages, and other securities.↩